TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
MATTHEW C. CHAN (Cal Bar No. 310411)
Special Assistant United States Attorney
JULIA HU (Cal. Bar No. pending)
Assistant United States Attorney
General Crimes Section
      1200/1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-7413/3802
      Facsimile: (213) 894-0141/6269
      E-mail:    matthew.chan@usdoj.gov
                 julia.hu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>YIXIN LI,<br>  aka "Eason Li," "Calvin Wong,"<br><br>YI CHEN,<br>  aka "Brian Chen"<br><br>          Defendants. | No. CR 21-75-MCS-1<br><br>GOVERNMENT'S MEMORANDUM IN SUPPORT OF APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE (18 U.S.C. § 3145) AS TO DEFENDANT YIXIN LI; DECLARATIONS OF JULIA HU AND CHRISTOPHER L. TAYLOR; EXHIBITS<br><br>[PROPOSED ORDER FILED SEPARATELY] |

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Julia Hu, hereby submits the government's application to review Magistrate Judge Maria A. Audero's order setting terms and conditions of release issued on March 2, 2021, (Dkt. 16), and to request detention of defendant YIXIN LI pending trial in the above-captioned case.

1

2      The government's application is based upon the attached

3 memorandum of points and authorities, the attached declarations of

4 Julia Hu and Special Agent Christopher Taylor, the exhibits submitted

5 in support of this application, the files and records in this case,

6 and such further evidence and argument as the Court may permit.

7 Dated: March 9, 2021           Respectfully submitted,

8                             TRACY L. WILKISON
                            Acting United States Attorney

9

10                             BRANDON D. FOX
                            Assistant United States Attorney
                            Chief, Criminal Division

11

12                                     /s/
                            MATTHEW C. CHAN

13                             Special Assistant U.S. Attorney
                            JULIA HU

14                             Assistant United States Attorney

15                             Attorneys for Plaintiff
                            UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

I.    INTRODUCTION...................................................4

II.   FACTUAL AND PROCEDURAL BACKGROUND..............................5

      A.   Offense Conduct..........................................5

      B.   Defendant's Attempts to Evade Law Enforcement............8

      C.   Charges, Arrest Efforts, and Detention Hearing...........9

III.  DEFENDANT SHOULD BE DETAINED BECAUSE NO CONDITION OR SET OF
      CONDITIONS CAN REASONABLY ASSURE HIS APPEARANCE OR THE
      SAFETY OF THE COMMUNITY......................................14

      A.   Legal Standards.........................................14

      B.   The Government Has Established by a Preponderance of
           Evidence Defendant's Risk of Nonappearance..............15

      C.   The Government Has Established By Clear and Convincing
           Evidence That Defendant Poses a Danger to the
           Community...............................................24

IV.   CONCLUSION...................................................25

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                  <u>PAGE(S)</u>

3

<u>**CASES**</u>

4

<u>United States v. Cai et al.,</u>
      CR No. 19-145-JAK.......................................passim

5

<u>United States v. Cohen,</u>

6
      No. CR 10-00547 SI, 2010 WL 5387757 (N.D. Cal. Dec. 20,
      2010)..................................................17, 24

7

<u>United States v. Del Vizo,</u>

8
      918 F.2d 821 (9th Cir. 1990)................................20

9

<u>United States v. Ellis DeMarchena</u>................................13

10

<u>United States v. Gebro,</u>

11
      948 F.2d 1121 (9th Cir. 1991)...............................15

<u>United States v. Hir,</u>

12
      517 F.3d 1081 (9th Cir. 2008)...........................22, 23

13

<u>United States v. Kazeem,</u>

14
      No. 1:15-CR-00172-AA, 2015 WL 4645357 (D. Or. Aug. 3, 2015)...21

<u>United States v. Khalil,</u>

15
      No. CR 13-062S, 2013 WL 2490564 (D.R.I. June 10, 2013).......17

16

<u>United States v. Koenig,</u>

17
      912 F.2d 1190 (9th Cir. 1990)...............................14

<u>United States v. Motamedi,</u>

18
      767 F.2d 1403, 1406 (9th Cir. 1985).....................15, 23

19

<u>United States v. Possino,</u>
      No. CR 13-00048-SVW-3, 2013 WL 1415108, at *7-8 (C.D. Cal.

20
      Apr. 8, 2013)...............................................24

21

<u>United States v. Reynolds,</u>
      956 F.2d 192 (9th Cir. 1992)................................24

22

<u>United States v. Rhule,</u>

23
      No. CR 20-0105-JCC-2, 2020 WL 5984072 (W.D. Wash. Oct. 8,
      2020)...............................................20, 21, 23

24

<u>United States v. Shelikhov,</u>

25
      468 F. App'x 54 (2d Cir. 2012)..........................18, 19

26

<u>United States v. Tarr,</u>
      No. 3:17-CR-00121-MOC-DCK, 2017 WL 2979684 (W.D.N.C. July

27
      12, 2017)...................................................17

28

United States v. Tortora,
    922 F.2d 880 (1st Cir. 1990)..................................22

United States v. Townsend,
    897 F.2d 989 (9th Cir. 1990)............................16, 18

United States v. Winsor,
    785 F.2d 755 (9th Cir. 1986)............................15, 23

**STATUTES**

18 U.S.C. § 1028A.........................................9, 16

18 U.S.C. § 1546.....................................9, 16, 17

18 U.S.C. § 3142.............................................15

18 U.S.C. § 371..........................................9, 16

8 U.S.C. § 1101.............................................17

8 U.S.C. § 1158.............................................17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Between no later than June 2015 through at least February 2021, YIXIN LI ("defendant") and co-defendant YI CHEN ("Chen") led an extensive conspiracy to defraud the U.S. immigration system by obtaining student visas for foreign nationals and duping U.S. colleges and universities into accepting them for admission and sponsoring their visas.  Under the guise of "educational consulting companies," defendants offered "guaranteed" admission for visa-seekers -- which they secured by way of hiring test-takers to take the visa-seekers' admissions exams, fake transcripts, and forged personal statements and recommendation letters -- in exchange for thousands of dollars per student.  (Dkt. 1 at ¶ 14.)

In 2019, following a federal investigation into the test-taking aspect of the scheme, six individuals paid to take admissions exams using doctored passports on behalf of visa-seekers were indicted and arrested in this District.  See United States v. Cai, et al., CR No. 19-145-JAK.  Defendant took to covering his tracks: he shut down his "education consulting company," moved out of his house and began switching among multiple residences, cars, and phone numbers, and engaged in at least three instances of counter-surveillance driving. Further, when agents initially attempted to execute the arrest warrant on defendant, he refused to turn himself in.  Although he eventually did so five days later, the charges in the indictment are significantly more serious than defendant likely anticipated (in comparison to the Cai charges), as they include conspiracy, seventeen counts of visa fraud, and aggravated identity theft.  Facing these charges -- and the ten-year mandatory maximum and two-year mandatory

consecutive sentence as well as the potential adverse immigration consequences that they carry -- defendant has every incentive -- and the demonstrated ability -- to flee.  Indeed, flight would pose little hardship to defendant, a Chinese national with few ties to this District, whose family resides in China, and who traveled back to China after being granted asylum.

At defendant's initial appearance in this case on March 2, 2021, the government sought detention based on defendant's risk of nonappearance.  Despite these abundant indicators of defendant's ability and intention to flee, the Magistrate Judge ordered defendant released on $200,000 in appearance bonds, home confinement, and GPS monitoring.[1]  Because none of these conditions -- nor any other set of conditions -- can reasonably assure defendant's appearance or the safety of the community, the government respectfully requests that this Court vacate the magistrate court's order releasing defendant on bond and order defendant detained pending trial.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Offense Conduct

Between June 2015 and February 2021, defendant and co-defendant Chen orchestrated a long-running and sophisticated scheme to exploit the U.S. immigration system and defraud U.S. colleges and universities into accepting foreign nationals and issuing the necessary documentation for their admission into the United States. Below is an explanation of how that scheme functioned.

---

[1] On March 5, 2021, the government filed an _ex parte_ application for a stay of the magistrate court's release order pending resolution of this application for review, which is still pending before the Court.

Foreign students seeking to study in the United States may enter the United States on a temporary basis if they obtain a F-1 Student Visa from the Department of Homeland Security ("DHS").  (Dkt. 1 at ¶ 6.)  Before such a visa may issue, the student must first be admitted to a college or university certified by DHS's Student and Exchange Visitor Program ("SEVP").  (Id.)  SEVP-certified schools set certain admission criteria, including, but not limited to, a minimum grade point average ("GPA"), passing scores on the Test of English as a Foreign Language ("TOEFL") and the Scholastic Achievement Test ("SAT"), and personal qualities to be assessed through personal statements and letters of recommendation.  (Id. ¶ 7.)  If a SEVP-certified school decides to admit a foreign national, it issues a Form I-20, which certifies that the student has met all admissions criteria and has been accepted for, and would be required to pursue, a full course of study.  (Id. ¶ 8.)  With a Form I-20, the student would become eligible for a F-1 Student Visa and could enter the United States.  (Id. ¶ 9.)

Under the guise of operating "educational consulting companies," defendant and co-defendant CHEN offered guaranteed college admission -- and accompanying student visa issuance -- to Chinese nationals in exchange for thousands of dollars per student.  In perpetuating this massive fraud, defendants deceitfully fulfilled each college admission criteria: they enlisted native English speakers to impersonate the visa-seekers using doctored passports and sit for their TOEFL exams, obtained and submitted false or altered transcripts, filled out application forms for visa-seekers, and submitted ghostwritten personal statements and recommendation letters.  (Dkt. 1 at ¶¶ 12-19.)

6

1    In 2019 and 2020, six of the individuals that were paid to
2 impersonate the visa-seekers and take their TOEFL exams were
3 convicted in this District of use of a false passport, in violation
4 of 18 U.S.C. § 1543.  See United States v. Cai, *et al.*, CR No. 19-
5 145-JAK, Dkt. 156, 159, 177, 193, 196, 216.  In his plea agreement,
6 the lead defendant, Liu Cai, admitted that a broker arranged for the
7 admission of Chinese nationals to SEVP-certified colleges and
8 universities and, as part of that scheme, paid Cai to take TOEFL
9 exams using doctored passports of the Chinese nationals seeking
10 admission.  Id., Dkt. 136 at 7; (Report of Investigation –
11 Investigative Findings Related to Yixin Li's Mortgage, Gov. Ex. C at
12 USAO_000011.)  As alleged in the indictment, defendant was one of the
13 masterminds behind this arrangement.  (See, e.g., Dkt. 1 at ¶ 14(b);
14 Gov. Ex. C at USAO_000011 (providing examples of payments that
15 defendant, in the name of his aka, "Calvin Wong," made to Cai).)
16 Defendant's conduct is the basis for the instant case, along with
17 that of co-defendant CHEN, who worked as an employee at defendant's
18 "educational consulting company."  (Dkt. 1 at ¶¶ 1-3.)

19    Defendant's conduct was not limited to brokering the testtaking
20 scheme.  As the sole owner of one of the educational consulting
21 companies that is the subject of the indictment, defendant also
22 obtained bogus or altered transcripts for his clients to reflect a
23 satisfactory GPA and paid a co-conspirator to write personal
24 statements and recommendation letters on their behalf.  (Dkt. 1 at
25 ¶¶ 1, 14(b), (c).)  Using these fraudulent test scores, transcripts,
26 and writings, defendant created application packages and submitted
27 them to U.S. colleges for their clients.  (Id. ¶ 14(d).)  Once it was
28 duped into accepting a particular student, the college would issue a

Form I-20 for the student, which made the student eligible for an F-1 student visa. (Id.)

**B. Defendant's Attempts to Evade Law Enforcement**

Since defendant learned of the Cai investigation, (see Tr. of Detention Hearing (Mar. 2, 2021), Gov. Ex. A at 10:18-20, 13:18-23), he has engaged in substantial efforts to evade law enforcement. To evade detection, defendant has been switching between different residences, cars, and phone numbers. Although defendant's address of record with the U.S. Citizenship and Immigration Services ("USCIS") as of February 5, 2021 -- and the address that he gave to Pretrial Services on the day of his initial appearance -- was 917 South Ramona Street, San Gabriel, California 91776 ("Ramona Street Residence"), agents' surveillance indicates that defendant has not lived there for some time.[2] (Gov. Ex. B at USAO_000004.) Indeed, on April 16, 2020, agents observed defendant putting containers into a moving truck outside the Ramona Street Residence and did not subsequently observe him there, despite conducting surveillance there on at least eight occasions between April and October 2020.[3] (Id. at USAO_000002-3.) In the meantime, agents learned from friends of the defendant that he was living at different addresses, including a friend's house in San Gabriel, California and an apartment that he had rented in Alhambra, California. (Id. at USAO_000003, 5.)

Similarly, defendant has been using several different cars, all of which are registered to other individuals. (See id. at

---

[2] The address listed on the Pretrial Services Report is "417 South Ramona Street," but this was likely a scrivener's error.

[3] On February 11, 2021, defendant was observed retrieving mail from the Ramona Street Residence. (Gov. Ex. B at USAO_000004.)

USAO_000002 (defendant observed in February 2020 driving a Mercedes Benz registered to N.C.); id. at USAO_000004 (defendant observed in February 2021 in a Honda Odyssey registered to Y.C.).)  To make monitoring even more difficult, according to defendant's friends, he is known to "frequently change[]" phone numbers.  (See id. at USAO_000005-6.)

Finally, defendant's evasion efforts have included at least three recent instances of counter-surveillance driving.  (Id. at USAO_000003-4.)  On February 4, 2021, for example, agents observed defendant driving a Mercedes that had earlier been associated with him and began following him by car.  (Id. at USAO_000003.) Defendant, who presumably detected he was being surveilled, began "performing erratic driving maneuvers such as making right turns from the far left lane, we[av]ing in and out of lanes, and performing two U-turns."  (Id. at USAO_000003-4.)  On February 11 and 17, 2021, agents were forced to discontinue surveillance after defendant engaged in similar counter-surveillance driving tactics.  (Id. at USAO_000004.)

### C.   Charges, Arrest Efforts, and Detention Hearing

On February 23, 2021, a grand jury in this District returned a twenty-one-count indictment against defendant and co-defendant CHEN. (Dkt. 1.)  The indictment charges both defendants with conspiracy to commit to visa fraud, in violation of 18 U.S.C. §§ 371, 1546(a), 2(b); seventeen counts of visa fraud, in violation of 18 U.S.C. §§ 1546, 2(b); and one count each of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  Arrest warrants issued for both defendants.

1        On February 25, 2021, Department of Homeland Security

2   Investigations ("HSI") Special Agent Christopher Taylor ("Agent

3   Taylor") arrived at defendant's address of record -- the Ramona

4   Street Residence -- to serve the arrest warrant. (Gov. Ex. B at

5   USAO_000004.) Tenant D.W. answered the door and agreed to contact

6   defendant by telephone. (Id.) Once the call was connected, Agent

7   Taylor identified himself and requested that defendant come to the

8   Ramona Street Residence immediately to be served with the arrest

9   warrant. (Id.) Defendant responded that he "could be there in two

10  hours." (Id. at USAO_000004-5.) Agent Taylor asked that defendant

11  come to the Ramona Street Residence immediately or tell him his

12  location. (Id. at USAO_000005.) Defendant refused Agent Taylor's

13  request, backtracked on his statement that he would come to the

14  Ramona Street Residence in two hours, and instead told Agent Taylor

15  to contact his attorney.[4] (Id.)

16       The next day, defense counsel informed the government that he

17  represented defendant and proposed defendant's self-surrender to

18  occur on the following Tuesday, March 2, 2021 because defense counsel

19  had another court hearing that same day. (Feb. 26, 2021 Email, Gov.

20  Ex. D at 1.) Given the amount of time requested -- four days -- and

21  defendant's prior evasion efforts, the government did not agree to

22  defense counsel's proposal and informed defense counsel that agents

23  would continue to look for defendant. (Id. at 1.) In the interim,

24  therefore, agents continued their efforts to find defendant,

25  including by surveillance and obtaining a ping warrant for two phone

26  _____

27       [4] Agents first informed defendant's last known attorney, Michael
     Plaut, of the arrest warrant. (Gov. Ex. B at USAO_000005.) Mr.

28   Plaut subsequently informed the government that he was only
     representing defendant in a pre-indictment capacity.

1  numbers associated with defendant.  (Gov. Ex. B at USAO_000005-6.)

2  Despite efforts to do so, agents were not able to locate defendant

3  over the weekend.  (Id. at USAO_000006-7.)[5]

4      Defendant turned himself in to U.S. Marshals on March 2, 2021.

5  However, during the booking process, Agent Taylor asked defendant if

6  he had brought his passport.  Defendant responded that it had been

7  stolen when his car was towed.  (Gov. Ex. A at 8:22-9:3; Taylor Decl.

8  ¶ 12.)  In direct contradiction to that statement, though, defendant

9  told the Pretrial Services Officer that he "does possess a Chinese

10 passport located at his residence" and, "[i]f required, he will

11 surrender his passport."

12     On the afternoon of March 2, 2021, defendant appeared before

13 Magistrate Judge Audero for his initial appearance.  The government

14 sought detention and proffered the indictment, (Dkt. 1), the Pretrial

15 Services Report but not its recommendation of bond, two reports of

16 investigation written by Agent Taylor, (Gov. Ex. B & D), and a

17 recorded lis pendens on the Ramona Street Residence, (Gov. Ex. D).

18 (Gov. Ex. A at 5:13-18.)  Defense counsel accepted the government's

19 proffer.  (Id. at 5:19-6:1.)  The government argued that defendant

20 posed a risk of nonappearance based on, among things, the fact that

21 he was a Chinese national whose family resided in the China; his lack

22 of ties to this District and the United States; the nature of the

23 instant charges and the serious possible penalties and immigration

24 consequences that they carry; defendant's extensive attempts to evade

25 law enforcement, which included switching phone numbers, residences,

26

27     [5] On Monday, March 1, 2021, the government reached out to
   defense counsel to see whether defendant still planned to turn
28 himself in the next day, which defense counsel confirmed.  (Mar.
   1 Email, Gov. Ex. F at 2.)

1    and cars and engaging in countersurveillance; defendant's initial

2    refusal to self-surrender when informed of his arrest warrant; and

3    defendant's failure to turn over his valid Chinese passport. (<u>Id.</u> at

4    6:20-9:11, 21:22-23:2, 24:8-24.)  The government also argued that

5    defendant posed a substantial economic danger to the community based

6    on the extensive fraud on the United States immigration system

7    perpetuated by defendant, which permitted unknown foreign nationals

8    to enter the country. (<u>Id.</u> at 9:12-22.)

9         Defense counsel argued for bond, and Pretrial Services

10   recommended that defendant be released on $200,000 in unsecured,

11   third-party appearance bonds. However, Pretrial's recommendation

12   appears to have based in part on an assumption that equity in the the

13   Ramona Street Residence, which defendant had represented belonged to

14   his mother in China, could be used to secure a bond.  In fact, the

15   government argued at the detention hearing that the property could

16   not be so used because, as alleged in the indictment and set forth in

17   a lis pendens that had been recorded on the property, the property

18   was subject to forfeiture as purchased with the proceeds of illegal

19   activity, and allowing a property that is subject to forfeiture to be

20   used to secure a bond would do little to guarantee defendant's

21   appearance for trial, as he will lose that property anyway if

22   convicted. (Dkt. 1 at ¶ 23(c)(i)), Gov. Ex. D.)  With no evidence

23   presented by the defense to refute these facts, Judge Audero declined

24   to accept the Ramona Street Residence as part of defendant's bond

25   package.[6] (Gov. Ex. A at 28:1-5.)  The only other surety that

26   _____

27        [6] At the detention hearing, the parties disputed whether
     defendant or defendant's mother, R.X., owned the property.  Although
28   the government argued based on the information that it had at the
                                            *(footnote cont'd on next page)*

1   defendant identified at the hearing was his friend J.B.C., who

2   indicated that he was willing to sign an unjustified appearance bond

3   for $50,000.  Despite no indication from J.B.C. that he was willing

4   to post a higher amount of bond, the magistrate court ordered that

5   defendant be released on a $100,000 unsecured appearance bond to be

6   posted by Mr. Cai and a $100,000 unsecured appearance bond to be

7   posted by an unidentified responsible third party.  (Dkt. 16 at 2;

8   Gov. Ex. A at 29:2-15.)  The release order also required that

9   defendant surrender his passport by March 5, 2021, remain in the

10  Central District of California, submit to location monitoring with a

---

time that title to the property was in defendant's name, (see Gov.
Ex. C at USAO_000012 (indicating that on February 16, 2018, a grant
deed was notarized acknowledging that defendant's mother transferred
the Ramona Street Residence to defendant)), the government has since
received information that defendant transferred title to the property
to his mother for no consideration on September 1, 2020 and recorded
that grant deed with the Los Angeles County Recorder's Office on
February 10, 2021.  (Grant Deed, Gov. Ex. G, at USAO_000137-40.)  The
government will file an amended lis pendens to correct the name of
the titleholder on the Ramona Street Residence.

    Even if title to the Ramona Street Residence is in defendant's
mother's name, it still is not effective collateral to secure the
defendant's appearance under these circumstances.  "[I]f the security
comes from an illegitimate source . . . , there is a paucity of moral
force compelling a defendant to reappear."  United States v. Ellis
DeMarchena, 330 F. Supp. 1223, 1226 (S.D. Cal. 1971).  Here, the
indictment alleges that the Ramona Street Residence was purchased
with proceeds of the illegal activity charged in the indictment,
(Dkt. 1 at ¶ 23(c)(i)), and the government provided evidence at the
detention hearing of examples of payments on the property's mortgage,
which was in defendant's name, that were traceable to the same bank
account that received payments from visa-seekers, (Gov. Ex. C at
USAO_000009-13).  Moreover, it is not clear how defendant's mother, a
Chinese national who lives in China, would be a "qualified" surety.
See Fed. R. Crim. P. 46(e); L. Cr. R. 46-3.3 (providing that the
surety of a bond with justification shall state under penalty of
perjury that she "resides within the Central District of California
or, if approved by the Court, that the surety resides elsewhere").
Should defendant's mother seek to challenge the government's claim to
the property, that is an issue to be resolved post-conviction.

13

1   location monitoring bracelet, and remain in his residence as directed
2   by Pretrial. (Dkt. 16 at 2-3.) Based on defense counsel's
3   representation that he would need three weeks to identify another
4   surety, the magistrate court set a deadline of March 22, 2021 for
5   defendant to meet the conditions of his release. (Dkt. 16 at 2; Gov.
6   B at 31:18-23, 37:3-25.)

7       Defendant is currently detained pending the identification and
8   approval of sureties and satisfaction of his other release
9   conditions. On March 5, 2021, the government filed an ex parte
10  application requesting a stay of the release order pending the
11  Court's resolution of the government's application for review of the
12  release order, which is still pending before the Court. On March 8,
13  2021, defense counsel informed the government and the Court that he
14  had found four sureties each willing to sign a bond for $50,000 and
15  that defendant had found his passport and would be turning it over to
16  the Court.

17      On March 8, 2021, co-defendant CHEN made his initial appearance
18  before Magistrate Judge Paul L. Abrams and was ordered detained
19  pending trial.

20  **III. DEFENDANT SHOULD BE DETAINED BECAUSE NO CONDITION OR SET OF
21      CONDITIONS CAN REASONABLY ASSURE HIS APPEARANCE OR THE SAFETY OF
      THE COMMUNITY**

22      **A.   Legal Standards**

23      This Court reviews the magistrate judge's release order de novo.
24  United States v. Koenig, 912 F.2d 1190, 1192-93 (9th Cir. 1990).
25  While this Court "is not required to start over . . . and proceed as
26  if the magistrate's decision and findings did not exist," it must
27  "review the evidence before the magistrate and make its own

28

1   independent determination whether the magistrate's findings are

2   correct, with no deference."  Id. at 1193.

3       A defendant must be detained pending trial where "no condition

4   or combination of conditions will reasonably assure the appearance of

5   the person as required and the safety of any other person and the

6   community."  18 U.S.C. § 3142(e)(1).  Detention is thus required

7   where a defendant presents either a risk of nonappearance or a danger

8   to the community.  United States v. Motamedi, 767 F.2d 1403, 1406

9   (9th Cir. 1985) (Kennedy, J.).  A finding that a defendant poses a

10  risk of nonappearance must be supported by a preponderance of the

11  evidence, while a danger finding must be supported by clear and

12  convincing evidence.  18 U.S.C. § 3142(f); United States v. Gebro,

13  948 F.2d 1118, 1121 (9th Cir. 1991) (per curiam).  In making those

14  findings, courts must consider: (1) the nature and circumstances of

15  the offense charged; (2) the weight of the evidence against the

16  defendant; (3) the history and characteristics of the defendant; and

17  (4) the nature and seriousness of the danger to any person or to the

18  community that would be posed by the defendant's release.

19  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th

20  Cir. 1986).

21      **B.    The Government Has Established by a Preponderance of
            Evidence Defendant's Risk of Nonappearance**
22
23      Based on defendant's extensive fraudulent conduct, sustained

24  efforts to evade law enforcement, lack of ties to this District,

25  Chinese citizenship and family ties to China, and numerous indicators

26  of his intention to flee the country, the government maintains that

27  no condition or set of conditions can reasonably assure defendant's

28  appearance in these proceedings.

15

First, the nature and circumstances of the offenses charged demonstrate defendant's ability to manipulate the legal system and, in particular, the United States's travel and immigration restrictions.  Defendant led a wide-ranging scheme, perpetuated under the guise of an educational consulting company, to fraudulently obtain F-1 student visas for Chinese nationals in exchange for large sums of money.  From enlisting native English speakers to impersonate visa-seekers and take their TOEFL exams to submitting fake transcripts and ghostwritten essays and recommend letters, (Dkt. 1 at ¶¶ 12-19), the sophistication with which defendant duped numerous colleges into issuing dozens of F-1 student visas to unknown foreign nationals can easily be -- and, as will be explained, already has been -- directed to fleeing from prosecution and law enforcement.

Moreover, "[c]onsideration of the nature of the offenses charged involves consideration of the penalties." United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990).  Here, not only does defendant face a statutory maximum of five years' imprisonment on the conspiracy count, 18 U.S.C. § 371, and ten years' imprisonment on each of the 17 visa fraud counts, 18 U.S.C. § 1546(a), but he also faces a statutory minimum of a two-year consecutive sentence on the aggravated identity theft count, 18 U.S.C. § 1028A(a)(1).  See Townsend, 897 F.2d at 995 ("[I]t is reasonable, from [defendants'] perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count.").  Although defendant's Sentencing Guidelines range will likely fall below that figure, "[y]ears in prison, even if only a few, represents a significant hardship for" someone like defendant, "considering his former luxurious lifestyle." United States v.

16

Cohen, No. CR 10-00547 SI, 2010 WL 5387757, at *7 (N.D. Cal. Dec. 20, 2010).

Aside from criminal penalties, defendant, a Chinese national, faces possible loss of immigration status and removal if convicted. See 8 U.S.C. § 1101(a)(43)(P) (defining "aggravated felony" to include an offense described in 18 U.S.C. § 1546(a) for which the term of imprisonment is at least 12 months); id. § 1158(b)(2)(A)(ii) (providing that "a final judgment of a particularly serious crime" is a bar to asylum eligibility); id § 1158(b)(2)(B)(i) (providing that an "aggravated felony" is per se a "particularly serious crime"). The specter of possible loss of immigration status means that defendant will have little incentive to voluntarily appear in these proceedings only to be removed upon conviction.  See, e.g., United States v. Tarr, No. 3:17-CR-00121-MOC-DCK, 2017 WL 2979684, at *4 (W.D.N.C. July 12, 2017) (finding that "defendant poses a significant risk of flight based" in part on "the seriousness of the charges he now faces which carry serious penalties . . . and could result in loss of immigration status"); United States v. Khalil, No. CR 13-062S, 2013 WL 2490564, at *1 (D.R.I. June 10, 2013) (same).

Given these facts, defendant's attempt to downplay the seriousness of the instant charges should be disregarded.  (See, e.g., Gov. Ex. A at 18:14-19:5.)  Although defendant tried at the detention hearing to analogize himself to the defendants convicted in United States v. Cai, et al., No. CR 19-145-JAK, who each received a sentence of two years' probation, defendant's situation is far more serious.  Whereas the Cai defendants' role in the conspiracy was limited to taking TOEFL exams using doctored passports, defendant is alleged to have been a ringleader who orchestrated the entire

17

fraudulent scheme and who profited accordingly.  See, e.g., United States v. Shelikhov, 468 F. App'x 54, 55 (2d Cir. 2012) (noting, in upholding detention order, defendant's "alleged leadership role" in the "sophisticated fraud scheme against the United States" charged). Indeed, each defendant in Cai pleaded guilty to a single count of use of a false passport.  See Cai, No. CR 19-145-JAK, Dkt. 156, 159, 177, 193, 196, 216.  Moreover, aside from Cai, who was deported following his conviction pursuant to a Judicial Order of Removal, see id., Dkt. 215, those other defendants were all United States citizens not facing the possibility of adverse immigration consequences.  Given these distinctions, defendant's suggestion that he should be given credit for not fleeing earlier despite knowing about the Cai prosecution -- and presumably, his own possible prosecution -- "for more than a year," (see Gov. Ex. A at 13:18-23), should be disregarded in its entirety.  Although defendant may have known that he could be prosecuted for his role in the TOEFL test-taking scheme, there is no indication that defendant understood the full extent of the charges now facing him.  "Facing the much greater penalties possible under the present indictment, . . . defendant[] ha[s] an even greater incentive to consider flight."  Townsend, 897 F.2d at 994.

Second, defendant's history and characteristics weigh overwhelmingly in favor of detention.  Defendant is a Chinese national whose entire family resides in China.  More troublingly, although defendant is in the United States on asylum from China, (Gov. Ex. A at 21:2), as the Pretrial Services Report noted, he travelled back to China in 2011 after being granted asylum, which calls into question how difficult it would be for him to move back

18

1    there.  And, although the Pretrial Services Report noted that

2    defendant has been living in the United States since 2010, the report

3    states that he first lived in San Francisco and does not state how

4    long he has lived in the Central District or what ties he has here.

5    Indeed, defendant put up for sale arguably his only tie to this

6    District, the Ramona Street Residence, in December 2020 after living

7    in it since 2017.  (Tr. 7:23-24; Taylor Decl. ¶ 10.)  In other words,

8    "flight -- specifically, flight to [China] -- would impose no

9    insurmountable personal or professional hardship on [defendant]."

10   Shelikhov, 468 F. App'x at 56 (internal quotation marks omitted).

11         In addition, as the Pretrial Services Report noted, defendant

12   has a 2014 conviction for obtaining and using another's personal

13   identifying information for an unlawful purpose, in violation of

14   California Penal Code § 530.5(a) (misdemeanor).  Despite being given

15   a chance for rehabilitation after that prior offense, defendant not

16   only has continued to engage in the same type of conduct but has done

17   so on a much larger scale.  That conduct casts significant doubt on

18   defendant's ability to abide by conditions should he be released on

19   bond.[7]

20         Moreover, the record reflects that defendant is skilled in

21   evading law enforcement.  Defendant has tried to circumvent detection

22   by switching between different residences, cars, and phone numbers.

23   Although defendant's address of record with USCIS -- and now,

24   Pretrial Services -- is the Ramona Street Residence, he has not lived

25   there for some time.  (Gov. Ex. B at USAO_000002-4.)  Rather, he has

26   been switching between various residences, including friend's houses

27   _____

28         [7] In 2019, defendant was also convicted of driving while on a
     suspended license, in violation of California Vehicle Code § 12500(a).

and an apartment that he had rented.  (Id. at USAO_000003, 5.)

Moreover, defendant has been using various cars, none of which are

registered in his name.  (See id. at USAO_000002, 4; Taylor Decl.

¶¶ 4-6.)  To make monitoring even more difficult, defendant is known

to "frequently change[]" phone numbers.  (Gov. Ex. B at USAO_000005-

6.)

Finally, defendant's evasion efforts include at least three

instances of counter-surveillance driving in February 2021, just

before his arrest in the instant case.  (Gov. Ex. B at USAO_000003-

4.)  That defendant "perform[ed] erratic driving maneuvers such as

making right turns from the far left lane, weening in and out of

lanes, and performing two U-turns" shows the lengths that defendant

is willing to go to avoid detection.  (Id.)  Not only can "driving or

acting in a counter-surveillance fashion . . . . be an[] indicant of

criminal activity," United States v. Del Vizo, 918 F.2d 821, 826 (9th

Cir. 1990), but it also establishes defendant's ability and intention

to evade law enforcement.  Given defendant's demonstrated "skills to

avoid detection," no conditions of release can reasonably assure his

appearance.  United States v. Rhule, No. CR 20-0105-JCC-2, 2020 WL

5984072, at *7 (W.D. Wash. Oct. 8, 2020).

To be sure, the defendant did eventually self-surrender in this

case.  (See Gov. Ex. A at 25:11-17, 28:19-22.)  However, as

explained, defendant initially refused agents' first attempt to

arrest him at the Ramona Street Residence and did not appear for

another five days following the agents' first attempt at arrest.

(Gov. Ex. B at USAO_000004-7.)  Against this backdrop and the

totality of the circumstances, the fact that defendant eventually

self-surrendered should be given less weight than it otherwise might

be.  See United States v. Kazeem, No. 1:15-CR-00172-AA, 2015 WL 4645357, at *3 (D. Or. Aug. 3, 2015) (concluding, despite defendant's self-surrender, that he nonetheless posed a serious risk of flight where, among other things, defendant was a Nigerian national charged with multiple counts of fraud, conspiracy, and identity theft and had significant ties to Nigeria).

The conflicting stories surrounding defendant's passport, which he did not bring to his initial appearance, evince a similar pattern of deceit.  As noted earlier, while defendant told Agent Taylor during booking that his passport had been "stolen," (Gov. Ex. A at 8:24-9:2; Taylor Decl. ¶ 12), he told Pretrial that his passport was "located at his residence" and would be surrendered if required. And, when Judge Audero point-blank asked defendant at the detention hearing "[i]s there a passport," he said "I'm not sure" and gave no definitive answer as to whether it was lost or could be retrieved. (Gov. Ex. A at 30:23-31:13.)  Although defense counsel informed the Court on March 8, 2021 that defendant had found his passport, his belated turning over of his passport gives little assurance that he will voluntarily appear for future proceedings.  See generally Rhule, 2020 WL 5984072, at *5 (defendant's failure "to inform the Probation Office about his application for a new passport suggests that he was trying to conceal the passport application from the Government even after he was arrested").  In any event, given the allegations in the indictment, (see, e.g., Dkt. 1 at ¶ 14(b) (alleging that defendants arranged for co-conspirators to take TOEFL exams using doctored passports)), it is not unlikely that defendant "could obtain false travel documents" and use them to leave the United States.  Rhule, 2020 WL 5984072, at *6.

21

1    Given defendant's ability and demonstrated intention to flee, it

2    is difficult to see how the conditions set in the magistrate court's

3    order -- or any other set of conditions -- can reasonably assure the

4    defendant's appearance.  As the Ninth Circuit has recognized, even

5    though proposed conditions may appear strict on paper, any assessment

6    of their effectiveness must account for the likelihood of defendant's

7    "good-faith compliance."  United States v. Hir, 517 F.3d 1081, 1092

8    (9th Cir. 2008).  Here, "the conditions as a whole are flawed in that

9    their success depends largely on the defendant's good faith -- or

10   lack of it.  They can be too easily circumvented or manipulated."

11   Id. (quoting United States v. Tortora, 922 F.2d 880, 887 (1st Cir.

12   1990)).  Such a flaw takes on particular significance where, as here,

13   little about the defendant or his history suggests that good faith

14   will be forthcoming.

15   Indeed, little of the information that defendant gave to

16   Pretrial Services -- information that Pretrial needs to effectively

17   supervise defendant -- is factually accurate.  For example, defendant

18   told Pretrial that he lives at the Ramona Street Residence, but, as

19   explained, law enforcement surveillance shows that he has not lived

20   there for some time.  Pretrial certainly cannot enforce the condition

21   that defendant reside as approved by Pretrial or that defendant be

22   "restricted" to his "residence every day" if defendant does not tell

23   them where he actually lives.  (Dkt. 16 at 2-3.)  Similarly,

24   defendant told Pretrial that he was running Prime US Education, but

25   he failed to disclose that Prime US has been defunct for some time

26   and that he is now affiliated with a new educational consulting

27   company known as Tensen International Consulting.  (Gov. Ex. B at

28   USAO_000003, 7; Taylor Decl. ¶ 7.)  Certainly, Pretrial cannot

1   supervise defendant's employment if defendant does not tell them

2   where he actually works.  (Dkt. 16 at 2.)

3       Given this context, the other conditions set by the magistrate

4   court suffer from the same fatal dependence on defendant's good-faith

5   compliance, which, as this record shows, is unlikely to be

6   forthcoming.  Although the magistrate court ordered location

7   monitoring, (Dkt. 16 at 3), it is well-known that "[a] GPS tracker

8   can be removed, and once it is, [defendant] could flee." Rhule, 2020

9   WL 5984072, at *6.  Nor can appearance bonds secured by affidavits of

10  sureties without justification assure defendant's appearance: "given

11  [defendant's] assets, he could easily reimburse them for any loss."

12  Id.  Indeed, although defendant told Pretrial that he has no assets

13  in the United States, he nonetheless readily offered at the detention

14  hearing to post $150,000 of his own money to secure his release.

15  (Gov. Ex. A at 27:6-9.)

16      On this record, there is simply "an unacceptably high risk that"

17  defendant would not "comply in good faith with the proposed, or any

18  other, conditions of release." Hir, 517 F.3d at 1093.  Detention is

19  thus required.

20      Finally, although it is the least important of the factors,

21  Winsor, 785 F.2d at 757, and "the statute neither requires nor permits a

22  pretrial determination that a person is guilty," Motamedi, 767 F.2d at

23  1408, the weight of the evidence against defendant is overwhelming.  The

24  one report of investigation that the government proffered at the

25  detention hearing for the limited purpose of demonstrating that the

26  Ramona Street Residence was purchased with the proceeds of illegal

27  activity was but a snippet of the evidence against the defendant in this

28  case.  (Gov. Ex. C; Gov. Ex. A at 22:18-23.)  Additional evidence

                                    23

supporting the charges in this case includes evidence obtained pursuant to federal search warrants, bank records, and other documentary evidence obtained in the course of the investigation.  All of the documentary evidence corroborates the statements of cooperators and other witnesses identifying defendant as a leader of the charged fraud scheme.

### C.   The Government Has Established By Clear and Convincing Evidence That Defendant Poses a Danger to the Community

For these same reasons, defendant also poses a risk of economic danger to the community.  The Ninth Circuit has directed courts to assess the risk of economic or pecuniary harm to the community posed by a defendant's release, and not just the risk of defendant's use of force or physical violence.  See United States v. Reynolds, 956 F.2d 192, 192 (9th Cir. 1992) (danger encompasses pecuniary or economic harm); see also United States v. Possino, No. CR 13-00048-SVW-3, 2013 WL 1415108, at *7-8 (C.D. Cal. Apr. 8, 2013) (detaining defendant in part based on a finding that he was an economic danger to the community, given his history of fraud); Cohen, 2010 WL 5387757, at *9 (same).

Here, defendant's documented pattern of committing fraud on the U.S. immigration system shows that his pretrial release would pose a substantial risk of economic danger to the community.  Not only did defendant defraud numerous U.S. colleges and universities into accepting foreign students based on completely false information about them, but he also induced the schools into issuing them Form I-20s.  (Dkt. 1 at ¶¶ 13, 14(d), 15.)  Equipped with a Form I-20, the foreign national then became eligible for a F-1 student visa.  (Id. at ¶¶ 6, 14.)  In this regard, defendant's fraud was not just on the colleges and universities, but on the integrity of the U.S.

immigration system, which relies on SEVP-certified colleges and universities to screen foreign applicants and report accurate information about them to DHS. (Id. at ¶ 11.) By submitting falsified information about potential applicants to secure their college admission -- and accompanying visa issuance -- defendant facilitated the entry of effectively unknown foreign nationals into the United States. Such conduct poses a clear danger to the community.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court vacate the Magistrate Judge's order setting conditions of release, (Dkt. 16), and order the defendant detained.

1

<u>DECLARATION OF JULIA HU</u>

2
I, Julia Hu, declare as follows:

3
1.   I am an Assistant United States Attorney in the United

4
States Attorney's Office for the Central District of California.  I

5
am assigned to represent the government in this matter.

6
2.   Attached as **Exhibit A** is the transcript of the initial

7
appearance and detention hearing for defendant held by the Magistrate

8
Judge on March 2, 2021.  I received this transcript from Court

9
Reporter Myra Ponce on March 6, 2021, who was authorized to release

10
it to me by virtue of an order issued by Magistrate Judge Audero on

11
March 5, 2021.  (Dkt. 22.)

12
3.   Attached as **Exhibit B** is a copy of a report of

13
investigation written by Agent Taylor dated February 28, 2021 on

14
investigative efforts to locate Yixin Li, which was proffered at

15
defendant's detention hearing and produced to defendant with Bates-

16
stamped numbers USAO_000001-7.

17
4.   Attached as **Exhibit C** is a copy of a report of

18
investigation written by Agent Taylor dated March 2, 2021 on

19
investigative findings related to Yixin Li's mortgage, which was

20
proffered at defendant's detention hearing and produced to defendant

21
with Bates-stamped numbers USAO_000008-13.

22
5.   Attached as **Exhibit D** is a copy of a <u>lis pendens</u> on

23
defendant's property located at 917 South Ramona Street, San Gabriel,

24
California 91776 that was recorded with the Los Angeles County

25
Recorder's Office on February 26, 2021, which was proffered at

26
defendant's detention hearing and produced to defendant.

27

28

1

6.     Attached as **Exhibit E** is a copy of an email dated February 26, 2021 between defense counsel and Special Assistant United States Attorney Matthew Chan.

7.     Attached as **Exhibit F** is a copy of an email dated March 1, 2021 between defense counsel and Special Assistant United States Attorney Matthew Chan.

8.     Attached as **Exhibit G** is a copy of a grant deed that was obtained by the United States Marshal Service on March 9, 2021, and has been produced to defense counsel with Bates-stamped numbers USAO_000136-45.  Although this was not proffered at the detention hearing on March 2, 2021, it is included to correct a representation that I made to the magistrate court then.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 9, 2021                          /s/
                                       JULIA HU
                                       Assistant United States Attorney